IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TREMAINE L. KITCHEN,                    *
           Plaintiff,

    v.                                  *      CIVIL ACTION NO. DKC-14-2022

OFFICER B. ICKES, et al.,               *

        Defendants.                 *
                         ***

## <u>MEMORANDUM OPINION</u>

Pending are a Motion to Dismiss filed by Wexford Health Sources, Inc. (ECF No. 20), and a Motion to Dismiss, or in the alternative, Motion for Summary Judgment filed by Correctional Officer B. Ickes as supplemented.  (ECF Nos. 22, 27 & 33).  Plaintiff has responded and Defendants have replied.  (ECF Nos. 24, 28, 32, 34, 35, 36 & 37).  Upon review of the papers and exhibits filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below, the motions will be granted.

## Background

The case was instituted upon receipt of correspondence from Plaintiff Tremaine Kitchen, an inmate held at the North Branch Correctional Institution ("NBCI").  ECF No. 1.  By way of a court directed supplemental complaint, Plaintiff claims that on June 10, 2014, he was fighting his cellmate when Officer Ickes directed the two to stop fighting.  ECF No. 4, p. 3.[1]  Plaintiff states that he "subdued his cellmate at some point to comply with the officer's order to stop fighting." *Id*.  Plaintiff avers that he had a tight grip on his cellmate and was holding him pinned to the floor when he called out to the officers for them to come into the cell, while he restrained his cellmate, so that the officers could handcuff both of them.  *Id*.  Plaintiff states that several officers requested the cell door be opened so they could enter the cell and handcuff the two inmates while they were on the ground not fighting, however Ickes said not to open the door.  Plaintiff asked Ickes why

---

[1]    Citations are to the court's electronic docket.

and Ickes yelled back that the inmates should not have been fighting.  Ickes then ordered Plaintiff to release his cellmate.  Ickes opened the feed up slot and sprayed pepper spray.[2] *Id.*, p. 3-4.

Plaintiff states that he then stood up and stepped away from the door and his cellmate. Plaintiff claims that when Ickes noticed Plaintiff had complied with the order, he sprayed the pepper spray directly in Plaintiff's eyes, mouth, and nose, choking and blinding Plaintiff. Plaintiff states that Ickes emptied the entire can onto Plaintiff, which rendered him defenseless and allowed his cellmate to attack him again.  *Id.*, p. 4.  Officer Cox then came to the cell door and sprayed his can of pepper spray at the Plaintiff and the cellmate to stop the assault upon Plaintiff.  *Id.* p. 4.

Plaintiff states that later that day he was waiting in a holding cell to be seen by medical staff and was choking and gagging from the pepper spray.  An unknown nurse came to examine him.  Plaintiff advised the nurse that he could not see, he suffered from glaucoma, and he could not breathe because he had ingested a lot of pepper spray.  He also advised the nurse that he bit his left upper lip.  *Id.*, p. 5.  Plaintiff states that the nurse wiped his left upper lip and advised him that she could not flush his eyes until after he took a shower because he was covered in pepper spray from the top of his head to the middle of his body.  *Id.*, pp. 5-6.

Later that evening Nurse Shannon and Officer Iser observed Plaintiff in his cell.  Shannon left to inquire whether NBCI would allow her to come back in order to flush the pepper spray out of Plaintiff's eyes but she did not return.  *Id.*, p. 6.

The following morning, Plaintiff was seen by Ophthalmologist Michael Summerfield who attempted to flush Plaintiff's eyes.  *Id.*, p. 6.  Plaintiff states that his retinas, corneas and outer layers of both eyes were severely burned by the pepper spray due to the denial of medical

---

[2]        Plaintiff refers to the use of mace.  ECF No. 4, p. 4.  Institutional records refer to the use of pepper spray.  *See* ECF No. 22-6, p. 2.

treatment.   Summerfield noted Plaintiff's eyes were photosensitive.   *Id*., p. 6-7.   Summerfield directed that staff should check Plaintiff every six hours because he was temporarily blind but NBCI staff never checked on him.   *Id*., p. 7.

Additionally, Plaintiff states that during the incident his sheets, mattress, towels, wash cloths, shirts, shorts, and tennis shoes were sprayed with the chemical agent by Ickes.   Some of the items were confiscated and discarded because of the pepper spray.   Plaintiff was transferred to disciplinary segregation and given his mattress and allowable property, but not provided any sheets to place on top of the mattress that was sprayed with pepper spray.   *Id*., p. 7.

**Second Supplemental Complaint**

Plaintiff filed a Second Supplemental Complaint (ECF No. 16) followed by a Motion to File a Second Supplemental Complaint.   ECF No. 25.   Ickes and Wexford moved to strike the Supplemental Complaint (ECF Nos. 19 & 20), and have also filed oppositions to his Motion for Leave to File.   (ECF Nos. 26 & 30).   For the reasons that follow, Defendants' Motions to Strike shall be granted in part and denied in part.

In his second supplemental complaint (ECF No. 16), Plaintiff alleges that he was subjected to the wrongful destruction of his property.   He reiterates his claim regarding Ickes' use of pepper spray and expands those claims.   Plaintiff indicates that Ickes used the pepper spray improperly in that it is to be used in short bursts per a use of force manual, rather than emptying the entire can.   Plaintiff further alleges that Ickes knew that NBCI did not have decontamination agents for use with pepper spray.   *Id*.   Plaintiff indicates that his ARPs regarding the incident were not properly investigated.   *Id*., p. 9.

All of the property in his cell, e.g., bed sheets, towels, shower bag, clothing, and hygiene items, were destroyed.   ECF No. 16, p. 2.   After the altercation he was not provided with a

confiscation form for all of his personal property items.   He states that his property was confiscated and destroyed.   *Id.*

On June 10, 2014, Plaintiff states, property room officer Bennett, inventoried Plaintiff's personal property after receiving Plaintiff in Housing Unit 1.   Bennett discarded Plaintiff's clothing that was covered with pepper spray and then discarded all of Plaintiff's excess property, which Plaintiff claims was allowable on general population but not allowed on disciplinary segregation.   *Id.* pp. 2-3.   That same day Bennett delivered to Plaintiff the property allowable on disciplinary segregation, including the mattress that had been covered in pepper spray.   Plaintiff states that Bennett should have thrown out the mattress, provided him a new one, and should have provided him with bed sheets.   *Id.*, p. 3.

On several occasions Plaintiff requested Officers Soltas and Beachy provide him a new mattress and sheets but they both replied that it was not their job.   *Id.*, p. 3.   Plaintiff states that his cellmate also complained to officers seeking to get Plaintiff a new mattress, to no avail.   The mattress soaked with pepper spray inflamed the burns on Plaintiff's body and burned the inner and outer areas of his eyes causing him pain, shaking and shivering.   *Id.*, pp. 3-4.   Plaintiff states he had to sleep on the contaminated mattress without sheets for weeks.   *Id.*, p. 4.

Plaintiff further alleges that the finance officer at NBCI failed to comply with this court's Order regarding the assessment of an initial partial filing fee.   *Id.*, p. 5.   He also claims that an effort to send outgoing mail was delayed by the Finance Officer for three weeks because the officer did not certify that the mail could be sent despite Plaintiff's inability to pay the postage. *Id.*, p. 6.

On September 10, 2014, Plaintiff's access to the GTC Telephone system was reprogrammed to block all of Plaintiff's outgoing calls. *Id*. Plaintiff indicates that he filed ARPs regarding these complaints but they were denied as being outside the ARP process. *Id*., p. 8.

On August 8, 2014, Property Room Officer Bennett committed an unauthorized inventory of Plaintiff's personal property as Plaintiff reentered general population. *Id*. p. 7. Plaintiff states that Bennett confiscated and discarded several pieces of Plaintiff's property including shower shoes, a pillow, a bowl, a cup, etc. Plaintiff states that again he was not provided a confiscation form. *Id*., p. 7.

Plaintiff states that on August 18, 2014, his "eyes began to push out the mace that had been stored when he enters and stands outside in sunlight. It feels like the sun is sucking the mace out of [his] eyeballs directly which causes him to cry tears of mace that burns his eyes and skin and down his face blinding him temporarily and making his eye sight blurry and hard to focus." *Id*., p. 7. Plaintiff was provided an eye exam on August 21, 2014. He was provided "a new prescription and glasses. The eye doctors could not explain why the Plaintiff was still feeling the effect of the mace." *Id*. Plaintiff was advised to submit a sick call slip which he did on several occasions. *Id*., p. 7-8.

Plaintiff states that since September 15, 2014, his had been denied medication for his bipolar disorder. He indicates that he suffers from withdrawal which forces him to stay in his bunk feeling nauseated and agitated. *Id*., p. 8.

As noted, Defendants move to strike the Second Supplemental Complaint. ECF Nos. 19 & 20. The motions shall be granted in part and denied in part. Plaintiff's Motion to File a Second Supplemental Complaint (ECF No. 26) shall be granted in part and denied in part. Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of

course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." F. R. Civ. P. 15(a)(1).  Defendants note that Plaintiff previously filed an amended pleading.  *See* ECF No. 4.  In cases of amendment not governed by F. R. Civ. P. 15(a)(1), "a party may amend its pleading only with the opposing party's written consent or the court's leave." F. R. Civ. P. 15(a)(2).  As noted, Defendants oppose the motion to amend.

Rule 15 dictates that "[t]he court should freely give leave when justice so requires." F. R. Civ. P. 15(a)(2).  Where, as here, the proposed amendment to the complaint appears to be a futility, this court has the discretion to deny leave to amend.  A court should deny a motion to amend as futile if the amended complaint could not survive a motion to dismiss under F. R. Civ. P. 12(b)(6). *Perkins v. United States,* 55 F.3d 910, 917 (4th Cir.1995) (*citing Glick v. Koenig,* 766 F.2d 265, 268–69 (7th Cir.1985)); *Frank M. McDermott, Ltd. v. Moretz,* 898 F.2d 418, 420–21 (4th Cir.1990) ("There is no error in disallowing an amendment when the claim sought to be pleaded by amendment plainly would be subject to a motion to dismiss under [Rule] 12(b)(6)."). Moreover, this court must conduct a preliminarily review of complaint allegations before service of process and dismiss them if satisfied that the complaint fails to state a claim upon which relief can be granted.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *see also Neitzke v. Williams,* 490 U.S. 319, 325 (1989) (dismissal of pro se complaint proper under 28 U.S.C. § 1915 when the complaint lacks "an arguable basis either in law or in fact.")

Plaintiff's property claims are futile.  In cases of negligent or intentional destruction of an inmate's property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy.  *See Hudson v. Palmer,* 468 U.S. 517, 533 (1984)(unauthorized

intentional deprivation of property by prison guard did not constitute violation of due process clause as meaningful post-deprivation remedies were available under state law); *Parratt v. Taylor*, 451 U.S. 527, 542-44 (1981)(negligent deprivation of inmate's property does not violate the due process clause, so long as meaningful post-deprivation remedies are available), overruled in part on other grounds, in *Daniels v. Williams,* 474 U.S. 327 (1986).   Plaintiff has remedies under Maryland's Tort Claims Act and through the Inmate Grievance Office.   The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post-deprivation remedy.   *See Juncker v. Tinney*, 549 F.Supp. 574, 579 (D. Md. 1982).[3]

The minimal facts contained in Plaintiff's Motion to Amend as to the delay in processing his mail, initial filing fee, and in regard to the disruption of his telephone service are insufficient to survive a motion to dismiss under F. R. Civ. P. 12(b)(6) or review under 28 U.S.C. § 1915 as they fail to set forth any facts or allegations as to how the named Defendants violated Plaintiff's rights.   Nor does it appear that Plaintiff has named the proper correctional employees responsible for the matters complained of.   Additionally, Plaintiff has failed to specify how he was injured as a result of any of the facts alleged.   The absence of an injury alone is enough to defeat Plaintiff's claims.   *See* 42 U.S.C. § 1997e(e) (barring inmate lawsuits where there is no showing of injury).

Plaintiff's additional claims regarding lack of follow-up medical care for pepper spray exposure and denial of medication to treat his bipolar disorder similarly fail to name appropriate parties and, as such, may not proceed.

In light of the foregoing, Plaintiff shall be allowed to supplement the complaint in so far as the allegations raised in the second supplemental complaint concern the claims raised in his

---

[3]        Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property, given *Juncker's* reliance on *Parratt* in dismissing Plaintiff's due process claim.

original complaint regarding the use of force by Ickes, the medical treatment rendered immediately thereafter, and his confinement to disciplinary segregation with a pepper spray soaked mattress and no sheets.  In all other respects, the Second Supplemental Complaint shall be stricken and Plaintiff's Motion to file same shall be denied.

## Standard of Review

A.  Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint.  *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).  The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007).  Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Id.* at 563.  The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

B.  Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

**Analysis**

**A.      Failure to Exhaust Administrative Remedies**

The court must first examine Defendants' assertion that Plaintiff failed to exhaust his administrative remedies prior to filing suit. The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Thus, the exhaustion provision plainly extends to Plaintiff's allegations. His Complaint must be dismissed, unless he has satisfied the administrative exhaustion requirement under the PLRA or Defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003).

In Maryland, filing a request for administrative remedy with the Warden of the prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure ("ARP") process provided by the Division of Correction to its prisoners.  If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction.  If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Executive Director of the Inmate Grievance Office ("IGO").  *See* Md. Code Ann. Corr. Serv. §§ 10-206, 10-210; Md. Regs. Code title 12 § 07.01.03.

Administrative remedies must, however, be available to the prisoner and this Court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials."  *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007).  The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.  *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006).  Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are.  *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006).  Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively.  *Id*. at 87.  Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond.  *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008), *see also Blake v. Ross*, __ F.3d __, 2015 WL 2405241 (4th Cir. May 21, 2015).

Thus, Plaintiff's claims must be dismissed if Defendants raise the affirmative defense and also prove that Plaintiff has failed to exhaust available remedies.  *See Jones*, 549 U.S. at 216 – 17 (failure to exhaust is an affirmative defense and inmates are not required to demonstrate exhaustion in their complaints).  The PLRA's exhaustion requirement is designed so that

prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003); *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review). Exhausting administrative remedies after a complaint is filed will not prevent a case from being dismissed for failure to exhaust administrative remedies. *See Neal v. Goord*, 267 F. 3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds). Exhaustion is a precondition to filing suit in federal court. *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) (prisoner may not exhaust administrative remedies during the pendency of a federal suit).

Plaintiff filed a request for administrative remedy (ARP) on June 16, 2014, NBCI 1792-14, solely complaining of Ickes' alleged use of excessive force when he responded to a fight between Plaintiff and his cellmate. ECF Nos. 22-3, pp. 4-5. Plaintiff filed two appeals of ARP decisions with DPSCS Headquarters, since June 10, 2014. Both were dated July 31, 2014. ECF No. 22-4. Plaintiff appealed the decision rendered in NBCI-1792-14 concerning Plaintiff's claim of excessive force. *Id*. The other ARP appeal, NBCI 1635-14, concerned Plaintiff's complaint that he did not receive welfare commissary. ECF No. 22-3, p. 2.

Since the incident, Plaintiff filed three grievances with the IGO. ECF No. 22-5. IGO 20141349 concerned an appeal form a decision regarding religious services. *Id*., p. 1. IGO 20141380 concerned an alleged breach of security by Officer Bennett in failing to secure shower

doors on May 6, 2014.  *Id.*, p. 2.  IGO 20142061 concerned an appeal of the decision regarding Ickes' deployment of pepper spray on June 10, 2014.  ECF No. 27-1, p. 1.

Plaintiff does not dispute that he failed to file an ARP concerning his claims regarding the mattress and lack of sheets.  *See* ECF 28-1, p. 23.  He baldy claims that his ARP appeals and commissioner's responses have been thrown out by unidentified staff but fails to explain which documents were destroyed, concerning which claims.  *Id.*, p. 38-39.  An index of Plaintiff's ARPs shows receipt and processing of 33 ARPs from March 21, 2007 through October 9, 2014.  ECF No. 22-3, p. 2-3.

In support of his opposition to the summary judgment motion he provides copies of the ARP he filed regarding his excessive force claim (ECF 28-3 (NBCI1792-14)), a copy of an appeal to the Commissioner regarding ARP NBCI 1792-14 alleging the Warden failed to respond to his complaint of excessive force in a timely manner (ECF 28-4), and a copy of his appeal to the Inmate Grievance Office of the decision in ARP NBCI-1792-14.  ECF No. 28-6.

In his appeal to the IGO dated September 4, 2014, filed well after the institution of the instant Complaint, Plaintiff again reiterates his claim of excessive force, and raises for the first time in his administrative procedure the claim that he was forced to sleep on a the pepper spray soaked mattress without sheets, and that he was not provided an eye flush.  *Id.*, p. 3.  This IGO appeal does not comply with ARP procedures in that it contains claims not previously raised in his ARPs.

The excessive force claim was investigated by the Internal Investigation Unit.  The court is aware that once a claim of excessive force is referred to IIU no further administrative remedy proceedings may occur.  In fact, the Commissioner's response to Plaintiff's ARP indicates that

that allegations of excessive force were investigated and reported to IIU and no further action was warranted through the ARP process.  ECF No. 28-4, p. 3.

In light of the foregoing, the court finds that Plaintiff has exhausted his available administrative remedies as to the excessive force claim.  Additionally, as claims regarding medical care are not subject to the state's administrative remedy process, plaintiff's claim regarding denial of medical care may also proceed.  Plaintiff's  claim regarding his pepper spray soaked mattress and lack of sheets while housed on disciplinary segregation, however, may not proceed as Plaintiff failed to institute an ARP regarding this claim in a timely manner, and thereafter failed properly to exhaust available remedies as to this claim before filing the instant Complaint.

### B.        Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U. S. 312, 321 (1986).  The absence of significant injury alone is not dispositive of a claim of excessive force.  *Wilkens v. Gaddy*, 599 U.S. 34 (2010).  The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  *Id*. at 34.

In the context of the use of pepper spray by prison staff, "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 440 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (emphasis omitted).  The use of pepper spray is not "per se a cruel and unusual punishment."  *McCargo v. Mister*, 462 F.Supp. 813, 818 (D. Md. 1978).  It may be used in order to control recalcitrant inmates.  *Williams*, 77 F. 3d at 763.  Analysis regarding the amount of chemical agent used focuses, as with all other excessive force claims, on whether the Defendant acted with a sufficiently culpable state of mind.  *Iko*, 535 at 238 (4th Cir. 2008) (citations omitted) (holding correctional officer not entitled to qualified immunity where additional chemical agent was deployed into inmate's cell after inmate attempted to comply with officer's order, did not react violently, and officer failed to remove inmate's clothes or secure medical care for inmate after chemical agent exposure).

Eighth Amendment violations have been found where an officer used more than a reasonable amount of a chemical agent.  *See, e.g., Furnace v. Sullivan,* 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and other officer also joined in); *Lawrence v. Bowersox,* 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff,* 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).  However, where an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable.  *See Williams,* 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan,* 19 F. App'x. 97, 102

(4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick,* 918 F.Supp. 977, 984 (N.D.W.Va.1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown).   Use of chemical agents is reasonable when an officer is attempting to maintain order and discipline in the institution.   *Santiago v. Walls,* 599 F.3d 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson,* 315 F.3d 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

In Plaintiff's Complaint, as well as in his ARP filed regarding the incident of June 10, 2014, he states that Ickes responded to a fight between himself and his cellmate.   Plaintiff admits he was involved in a fight with his cellmate and that Ickes ordered him to release his cellmate from his grip, which Plaintiff initially refused to do.   ECF Nos. 1 & 4, ECF No. 22-3.   Ickes avers that he was assigned to Housing Unit 2 B Tier on June 10, 2014, when he heard a disturbance coming from Plaintiff's cell.   ECF Nos. 22-6; 22-7, pp. 2-5.   When Ickes arrived at the cell he saw Plaintiff and his cellmate, Timothy Kittrell, exchanging punches.   *Id.*   Ickes called for assistance and Officer Cox arrived as Ickes gave the inmates orders to stop fighting.   ECF No. 22-8. Plaintiff and his cellmate refused to stop fighting.   Ickes sprayed a burst of pepper spray through the security slot to the head of both inmates.   Cox and Ickes continued to give orders to the inmates to stop fighting.   ECF No. 22-7, pp. 2-5.   Cox then sprayed pepper spray through the security slot hitting the inmates in the upper torso.   Cox again directed the inmates to stop fighting.   *Id.*   They stopped and both came to the security slot in order to be handcuffed.   Another officer handcuffed the inmates through the slot and Cox called for the cell door to be opened. Plaintiff was escorted by Officers Lease and Yutszy to the C/D Holding Cell for medical

treatment.  *Id*.  Nurse Cortez responded and provided medical treatment.  ECF Nos. 22-7, pp. 2-5; 22-9, pp. 4-6.

Plaintiff was photographed, strip searched, and provided with a decontamination shower. ECF No. 22-7, pp. 2, 4.  A video of the incident does not provide much information.  The video shows the officers gathering at Plaintiff's cell door, and it appears that they are speaking through the door, pepper spray is sprayed and the doors are opened.  ECF No. 22-11.  From the arrival of the first officer at Plaintiff's door to the door being opened approximately one minute elapses.  *Id*. Plaintiff was interviewed by Lt. Pennington, but declined to provide a written statement.  ECF Nos. 22-7, pp. 2, 7, 8; 22-10.  Pennington determined the level of force used was appropriate and consistent with DPSCS use of force policies.  ECF Nos. 22-7, p. 2, 22-10.

Plaintiff was served with a notice of inmate rule violation charging him with violating inmate rule 102 (assault or battery on an inmate) and rule 400 (disobeying an order).  ECF No. 22-12, p. 7.  At the disciplinary hearing Ickes' sworn statement that Plaintiff was fighting, was ordered to stop, failed to comply, and Ickes then sprayed pepper spray through the security slot was received.  ECF No. 22-12, p. 7.  Plaintiff pled guilty to both rule violations.  *Id*., p. 14. Plaintiff appealed the sanction imposed, not his plea, and in his appeal admitted he participated in the fight and stated he did not "have any animosity toward [his cellmate] or your staff for doing there job." (sic)  *Id*., p. 3.

It is clear that some force was necessary in order to quell the fight between Plaintiff and his cellmate and extract the inmates from the cell.  Plaintiff was given a direct order to stop fighting, which he refused.  In his opposition, Plaintiff states that he complied with Ickes' order to release his cellmate and only after releasing his cellmate and backing away from him did Ickes spray the pepper spray.  ECF No. 28-1, p. 6.  Plaintiff disputes where the pepper spray was

applied to him and the amount of pepper spray deployed, claiming Ickes emptied the entire can of pepper spray.  *Id*., pp. 7, 9, 30-31.  Plaintiff admits to fighting with his cellmate and admits his initial refusal to comply with Ickes' orders.  He alleges that Ickes and the other correctional staff are lying, he disputes the need for the use of pepper spray, opining that the officers could have come into the cell and handcuffed the inmates.  *Id*. p. 35.  He does state, however, that even though he complied – eventually – with the order to stop fighting, his cellmate did not – and he continued the fight until pepper spray was used a second time.

Taking the facts in the light most favorable to Plaintiff his claim nevertheless fails as his disputes of fact are not material to the determination of his claims.  He admits that he refused to release his grip on his cellmate when directed to do so.  Faced with Plaintiff's refusal to release his hold on his cellmate, Ickes sprayed pepper spray through the security slot in the door in order to gain Plaintiff's compliance with a direct order, and in order to stop the assault between the inmates.  Plaintiff's injuries were consonant with the use of pepper spray.  Even if Plaintiff had released his cellmate prior to Ickes deploying the pepper spray as Plaintiff claims, and even if Ickes deployed the entire can of pepper spray, there is simply no evidence that in the brief interlude of the altercation, viewed through the cell door slot, that Ickes was objectively aware that Plaintiff and his cellmate had complied with the numerous orders to disengage and subjectively perceived that the use of pepper spray in the amount deployed was no longer necessary to restore order.[4]  Unlike the facts which were undisputed in *Iko v. Shreve*, wherein the inmate was not in a violent confrontation with anyone, the officers saw the inmate place his hands

---

[4]       In his opposition to Ickes' dispositive motion, Plaintiff alleges, for the first time, that he had requested Ickes move him out of his cell because he did not get along with his cellmate.  Plaintiff states that Ickes advised he would move him the following morning but Plaintiff told Ickes he needed to be moved immediately due to the tension between Plaintiff and his cellmate.  ECF No. 28-1, p. 5.  Any claim that Ickes failed to protect him from a known risk of harm is not properly before the court, having been raised for the first time in Plaintiff's opposition and will not be considered.

through the feed up slot in an effort to comply with the orders to be handcuffed, and officers saw the inmate lay on the floor in an act of submission,[5] there is no evidence here that the correctional officers were aware that Plaintiff had complied with their orders to stop fighting and be handcuffed.  The facts demonstrate the contrary, as immediately after Ickes ceased his use of pepper spray, according to Plaintiff, he and his cellmate again began to fight requiring Officer Cox to spray additional pepper spray into the cell in order to quell the violence.  It was only after this second burst of pepper spray by Cox that all fighting in the cell ceased and the inmates complied with the orders to be handcuffed.  In light of the foregoing it is clear that Ickes' use of pepper spray was not excessive in relation to the need to restore order and protect the inmates who continued to fight.  The record "falls far short" of showing there was "no plausible basis for [Ickes'] belief that this degree of force was necessary." *Whitley,* 475 U.S. at 323.

Plaintiff's subjective belief that a lesser amount of pepper spray could have been used or that Ickes should have placed himself in harms' way by entering the cell while Plaintiff continued to hold his cellmate restrained on the floor, is of no legal significance.  As the Fourth Circuit explained in *Williams,* "[a] limited application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate.  Moreover, prompt washing of the maced area of the body will usually provide immediate relief from pain." *Williams,* 77 F.3d at 763 (citing *Soto,* 744 F.2d at 1262).  Here the application of the pepper spray ceased as soon as the inmates stopped fighting, they were immediately removed from their cell, and Plaintiff was provided a change of clothes and a shower.  Prompt washing and medical attention have been considered a sufficient step to mitigate the use of chemical agents. *See Williams, supra,* 77 F.3d at 763.

---

[5]     *Iko v. Shreve,* 535 F.3d 225, 231 (4th Cir. 2008).

To the extent Plaintiff complains that Ickes failed to follow established DPSCS policies and procedures regarding the amount of pepper spray to be used, his claim fails.  To the extent that written directive regarding the use of pepper spray or use of force in general were not followed to the letter, the adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process.  *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[6]

## C.   Medical Claim

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984).  Supervisory liability under § 1983 must be supported with evidence that:  (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

---

[6]    Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met.  *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

Plaintiff's claims against Wexford Health Source, Inc. lack personal involvement in the delivery of onsite health care to Plaintiff and are insufficient to state a claim against the named Defendant.  Plaintiff has pointed to no action or inaction on the part of Wexford that resulted in a constitutional injury, and accordingly, his claims against Wexford Health Source, Inc., shall be dismissed.

Even if Plaintiff had named the proper individual health care providers, they would be entitled to summary judgment.  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of  its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.  The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839‒ 40.  "True subjective recklessness

requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), *quoting Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown* 240 F. 3d at 390; citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge). Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975).

The record evidence demonstrates that Plaintiff was assessed immediately following the June 10, 2014 altercation. ECF No. 22-9, pp. 4-6. Plaintiff reported his skin was burning and requested a shower. Plaintiff had a small laceration to his lower lip. His teeth were intact and his gait steady. He was provided a shower immediately following the altercation in order to wash the

pepper spray off his body.  The following day, Plaintiff was evaluated and it was noted he had bilateral large corneal abrasions.  His eyes were rinsed and he was provided erythromycin ointment.  It was also noted that his eyes were less red and the sensation of having a foreign body in his eye was resolving.  *Id*., pp. 7, 27.  He was seen again on June 20, 2014, and again the corneal abrasions were noted.  *Id*., p. 9.  It was noted that he was again prescribed erythromycin eye ointment by the ophthalmologist, Dr. Summerfield, but Plaintiff stated he did not receive same.  He was scheduled for a follow up visit with Dr. Summerfield and seen for examinations on July 9, 2014, August 21, 2014 and October 8, 2014, *Id*., pp. 28-31.  Plaintiff's medical records do not note any complaint by Plaintiff that his skin was burned nor is there any documentation of such an injury. *Id*., p. 3-31, 10-48.

Plaintiff notes that he was not scheduled to see Summerfield due to his exposure to pepper spray, but rather as part of his regular Glaucoma treatment.  ECF No. 28-1, p. 26.  The basis for Plaintiff being treated by Dr. Summerfield is of no legal moment, the undisputed facts remain that Plaintiff was provided a decontamination shower immediately following his exposure to pepper spray and treated by an ophthalmologist less than 24 hours the exposure.  Plaintiff complains that he was not provided saline eye drops which he claims are stored throughout the facility and the standard protocol for treating pepper spray exposure.  *Id*., p. 41.  Such a complaint, however, is nothing more than a disagreement with the course of treatment provided.

Mere disagreement with a course of treatment does not provide the framework for a federal civil rights complaint.  *See Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).  Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor.  Plaintiff has failed to submit any evidence to support his claim that Wexford employees provided constitutionally inadequate

medical care.  Medical providers made sincere efforts to address his medical needs and provide appropriate treatment.

### Conclusion

Defendants' dispositive motions will be granted.  A separate Order follows.


Date:  July 14, 2015               _____/s/_____
                                                            DEBORAH K. CHASANOW
                                                            United States District Judge